2006 UT 16

**Lawrence W. SEARLE and Ann C. Searle, Plaintiffs and Appellants,**

v.

**MILBURN IRRIGATION COMPANY, William M. Hamilton, and The Utah State Engineer, Jerry D. Olds, P.E., Defendants and Appellees.**

**No. 20040406.**

Supreme Court of Utah.

March 10, 2006.

Rehearing Denied March 8, 2006.

Bryan J. Pattison, St. George, for plaintiffs.

Mark L. Shurtleff, Att'y Gen., Heather B. Shilton, Norman K. Johnson, Asst. Att'ys Gen., Salt Lake City, for defendant Utah State Engineer Jerry D. Olds, P.E.

John H. Mabey, Jr., David C. Wright, Salt Lake City, for defendant Milburn Irrigation Company.

## AMENDED OPINION

DURRANT, Justice:

¶ 1 In this case, we are called upon to address several questions concerning the procedure applicable to the approval or rejection of applications proposing a change in water use. More specifically, we must determine whether the district court properly invoked the preponderance of the evidence standard of proof and correctly allocated the burden of proof when rejecting a change application. Additionally, we must decide whether a change applicant's prima facie showing that no impairment of vested water rights will result from application approval can be successfully undermined by circumstantial evidence demonstrating the probability of impairment.

¶ 2 When considering the change application at issue in this case, the district court utilized a burden-shifting approach whereby the change applicant was first required to show "reason to believe" that approval of the application would not result in impairment of vested water rights. After that initial showing, the district court shifted the burden to the protesting party to show, by a preponderance of the evidence, that approval of the application would result in impairment of vested rights. We conclude that the approach adopted by the district court is inharmonious with our case law and that a remand is therefore necessary. We hold that an applicant seeking a change in water use need only show reason to believe that approval of the application will not result in impairment of vested water rights and that the applicant bears the burden of persuasion throughout the application process. A protestant may, however, successfully oppose application approval by producing either direct or circumstantial evidence that sufficiently undermines the applicant's showing that the use proposed can be accomplished without impairing vested rights. After explaining the factual background of the present case, we will analyze each of the issues identified above.

## BACKGROUND

¶ 3 Appellants Lawrence and Ann Searle own property on the Wasatch Plateau, which plateau forms the east boundary of the Sanpete Valley in Sanpete County, Utah. The Searles purchased the property in 1999, intending to construct a cabin on the site. However, in order for the Searles to obtain a building permit, they were required to establish the presence of an on-site source of water sufficient to meet the needs of the cabin.

¶ 4 In an effort to satisfy this requirement, the Searles purchased water right number 65–2977, which carries a priority date of 1956. As owners of that water right, every year the Searles are entitled to one half-acre foot of water, to be used for irrigation purposes, from April 1 to October 31. The point of diversion for the Searles' water right is a well located near the town of Chester, Utah, in the Sanpete Valley. The Chester well is a significant distance from the Searles' cabin property, and thus the Searles' water right does not currently satisfy the requirement of on-site water. Therefore, after acquiring the water right, the Searles sought to change the point of diversion, place of use, and nature of use of the water right. Specifically, the Searles desired to change the point of diversion to an existing well, known as the Jacob-

sen well, located near their cabin property, and to use the water for stockwatering and domestic purposes year round, rather than for seasonal irrigation. Taking the first step in the process to perfect such a change in use, the Searles properly completed and filed a change application with the State Engineer. The change application was advertised as required by Utah Code section 73–3–6 (Supp. 2004), and Appellee Milburn Irrigation Company ("Milburn") timely protested the Searles' application.

¶ 5 Milburn is a Utah corporation consisting of approximately twenty-six shareholders and is operated with the purpose of distributing water to its shareholders via gravity-pressurized sprinkler irrigation systems. Milburn owns water right number 65–2256, which carries a priority date of 1876. Milburn's water right entitles the company to divert 8.875 cubic feet of water per second from the South San Pitch River, also known as the South Fork of the San Pitch River, annually during the period of April 1 to October 15 to irrigate 639.9 acres. Typically, Milburn is not able to satisfy the entire amount of its water right during that period, as water flow slows as the summer wears on. By August, Milburn is usually only able to divert just one cubic foot per second.

¶ 6 Milburn's protest against the Searles' change application was motivated by Milburn's concern that the Jacobsen well, which is located in the drainage area that contributes to Milburn's source of water, is connected in some degree with Milburn's water source and that the Searles' use of that well could further exacerbate water shortfalls that Milburn has been experiencing for many years.

¶ 7 The State Engineer convened a hearing to address the concerns raised by Milburn's protest. After hearing testimony and argument concerning the possibility of a connection between the Jacobsen well and Milburn's water source, the State Engineer rejected the Searles' change application, concluding that "the area proposed for diversion could serve as a contributing source for [Milburn's] water supply." After the Searles' request for reconsideration was denied, the Searles filed the current action, seeking judicial review of the State Engineer's decision.[1]

¶ 8 The district court, hearing evidence de novo, was supplied with testimony from three expert witnesses on the issue of impairment. The Searles' expert, Gerald B. Robinson, Jr., testified that the deep water aquifer supplying the Jacobsen well is not connected to Milburn's water source. According to Robinson, if Milburn's water source was connected to the Jacobsen well, Milburn would not experience water shortfall in the summer months because the deep aquifer would keep the river saturated at all times. Robinson also testified that Milburn's water source does not exhibit the artesian pressure found in the Jacobsen well and that is generally observed in the Sanpete Valley, an indication that the water sources are independent of one another.

¶ 9 Two expert witnesses countered Robinson's conclusion. Both experts were of the opinion that the two water sources are connected in some fashion. Kirk Forbush testified that, while Robinson may be correct that water from the Jacobsen well generally travels in such a fashion as to bypass Milburn's water source, some of that water is contributing to the base flow of the South San Pitch River. Forbush reasoned that since the South San Pitch River has a base flow regardless of whether there is snow melt, the river must have an additional source of water. He further testified that the Jacobsen well is located in a formation that supplies water from consolidated rock into springs and streams, which, in turn, augment the flow of the San Pitch River. Accordingly, Forbush concluded that if the Searles use water from the Jacobsen well, Milburn's water supply will suffer. Charles Williamson, a stream alteration specialist, essentially con-

---

1. Change application proceedings are designated as informal adjudicative proceedings, *see* Utah Admin. Code r655–6–2 (2005), for which judicial review under the Administrative Procedures Act is available. *See* Utah Code Ann. § 73–3–14 (1989); *see also id.* § 63–46b–15(1)(a) (2004) ("[D]istrict courts have jurisdiction to review by trial de novo all final agency actions resulting from informal adjudicative proceedings...."); Utah Admin. Code r655–6–18 (providing for judicial review in accordance with sections 63–46b–14 and –15 of the Utah Code).

curred in the reasoning of Forbush but also suggested that the lack of artesian pressure at Milburn's water source and the presence of such pressure at the Jacobsen well could possibly be explained by elevation differences.

¶ 10 After hearing the evidence relevant to the impairment issue, the district court reached the same conclusion as the State Engineer, stating in a ruling from the bench that "I'm ... convinced that there's—by a preponderance of the evidence, that the rights of [Milburn] will be impaired if the application is approved." The Searles now appeal from the district court's order denying their change application. On appeal, the Searles contend that the district court imposed an impermissibly light burden on Milburn.

¶ 11 Specifically, the Searles maintain that once they established a prima facie case that approval of their change application would not result in the impairment of vested rights, the burden shifted to Milburn to show that the approval of the application would actually result in such impairment, not merely that impairment would likely occur. Therefore, the Searles claim that the district court incorrectly required Milburn to meet its burden by a preponderance of the evidence. According to the Searles, Milburn's burden should have been much higher. Although the Searles shy away from labeling the standard they feel should be properly imposed in circumstances such as this, they are, in essence, requesting a rule that requires parties protesting change applications to provide clear and convincing evidence demonstrating impairment before a change application can be rejected.

¶ 12 Taking a different approach, the State Engineer urges us to affirm the result reached by the district court, but to repudiate the burden-shifting scheme it utilized. According to the State Engineer, the burden of persuasion remains on change applicants throughout the application process to establish by a preponderance of the evidence that application approval will not result in impairment. Milburn argues, however, that we should affirm the district court and expressly adopt the burden-shifting approach it used.

After articulating the appropriate standard of review, we will address the parties' arguments. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(f) (2002).

## STANDARD OF REVIEW

¶ 13 To resolve the issues before us, we must determine whether the district court (1) properly invoked the preponderance of the evidence standard of proof, (2) appropriately allocated the burden of proof, and (3) correctly concluded that a change applicant's prima facie showing that no impairment will result from application approval can be undermined by circumstantial evidence demonstrating the probability of impairment.

¶ 14 As to the first issue, we review a district court's determination of the proper standard of proof for correctness, as discerning the appropriate standard to apply in any given case involves statutory interpretation or interpretation of case law. *See generally State v. Pena,* 869 P.2d 932, 935 (Utah 1994) ("Legal determinations ... are defined as those which are not of fact but are essentially of rules or principles uniformly applied to persons of similar qualities and status in similar circumstances."); *see also Hansen v. Hansen,* 958 P.2d 931, 933 (Utah Ct.App. 1998) (reviewing a trial court's invocation of a clear and convincing standard of proof for correctness); *In re R.N.J.,* 908 P.2d 345, 349 (Utah Ct.App.1995) (stating that whether a trial court applied the appropriate standard of proof is a question reviewed for correctness) *superseded by statute on other grounds as stated in In re E.H.H.,* 2000 UT App 368, ¶ 16, 16 P.3d 1257. The identical standard of review applies to the second issue on appeal, as it is well established that we review a court's allocation of the burden of proof for correctness. *Beaver County v. Utah State Tax Comm'n,* 916 P.2d 344, 357 (Utah 1996).

¶ 15 Finally, turning to the third issue on appeal, we note that we have never had occasion to articulate the standard of review applicable to a district court's rejection of a change application when the ground for that rejection is the probability that vested water rights will be impaired by the use proposed in the application. This issue is best viewed

as a mixed question of fact and law, as the district court must first find facts relevant to the issue of impairment and then determine whether those facts are within the ambit of "impairment" such that the change application should be rejected. *See Jensen v. IHC Hosps., Inc.,* 2003 UT 51, ¶ 57 n. 11, 82 P.3d 1076 ("A mixed question involves ... the determination of whether a given set of facts comes within the reach of a given rule of law." (internal quotation marks omitted)); *cf. Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co.,* 2004 UT 67, ¶ 43, 98 P.3d 1 (reviewing a district court's determination that water was put to beneficial use as a mixed question of fact and law).

¶ 16 When reviewing a district court's conclusion regarding a mixed question of fact and law, we typically grant some level of deference to the district court's application of the law to the facts. *See Pena,* 869 P.2d at 937–39 (discussing role of appellate courts in setting limits on the amount of discretion district courts enjoy when applying law to facts). "The measure of discretion afforded varies, however, according to the issue being reviewed." *State v. Hansen,* 2002 UT 125, ¶ 26, 63 P.3d 650. We consider multiple factors when determining how much deference to grant a district court's application of law to facts. *Jeffs v. Stubbs,* 970 P.2d 1234, 1244 (Utah 1998). Specifically, we analyze whether (1) the facts at issue are so complex and arise in such variation that it would be impractical to supply a rule that adequately accounts for the implications of all the facts; (2) the context in which the application of law to facts occurs is somehow novel or new, such that appellate courts are unable to discern and clearly state what factors are outcome determinative; and (3) the district court has observed facts that are not adequately preserved by a record of the proceedings before it, e.g., witness demeanor. *Pena,* 869 P.2d at 938–39.

¶ 17 In the present case, consideration of the three *Pena* factors leads us to conclude that at least some deference should be granted to the district court's application of the law to the facts. First, there are myriad factual scenarios, interplaying with complex scientific principles, that can arise when determining whether approval of a change application will result in impairment of vested rights, making it exceedingly difficult to craft a uniform rule neatly applicable in all situations. *See generally Crafts v. Hansen,* 667 P.2d 1068, 1071–80 (Utah 1983) (discussing in detail the affidavits of experts who addressed various factual scenarios when opining as to the possibility of impairment in five separate cases involving change applications). Second, although reported cases discussing the possibility of impairment stretch far back in this state's history, our case law has not yet meaningfully constrained a district court's discretion to conclude that evidence of impairment is sufficient to prevent approval of a change application. Third, and finally, the district court enjoys an appreciable advantage over appellate courts in this context due to its ability to assess witness demeanor and credibility, factors that are not readily discernable from a cold record. *See Pinecrest Pipeline Operating Co.,* 2004 UT 67, ¶ 48, 98 P.3d 1.

¶ 18 However, given the importance of water in this state, there is a strong public policy interest in promoting consistent and predictable results in disputes over the permissible use of that water. Therefore, it is appropriate that district court discretion be somewhat constrained in this area. *See Jeffs,* 970 P.2d at 1244 (stating that appellate courts, when setting discretionary limits, should consider the policy interest in creating "standard uniformity among trial courts addressing the question"). Consequently, we conclude that district courts enjoy significant, but not broad, discretion when determining whether evidence of impairment is sufficiently compelling to foreclose application approval. *Cf. Pinecrest Pipeline Operating Co.,* 2004 UT 67, ¶ 50, 98 P.3d 1 (granting "significant, though not broad, discretion" to a district court determination that water had been put to beneficial use). Having outlined the appropriate standards of review, we now turn to the issues raised in this appeal.

## ANALYSIS

¶ 19 To resolve the issues before us, we must determine whether the district court (1)

properly invoked the preponderance of the evidence standard of proof, (2) appropriately allocated the burden of proof, and (3) correctly concluded that a change applicant's prima facie showing that no impairment will result from application approval can be undermined by circumstantial evidence demonstrating the probability of impairment.

¶ 20 On appeal, Milburn contends that the district court's approach was correct, while both the State Engineer and the Searles contend that the district court's approach was flawed. Although the State Engineer and the Searles agree that the district court's approach was flawed, they disagree as to the appropriate outcome of this appeal. Specifically, the State Engineer requests that we not disturb the result reached by the district court, but that we merely correct the mechanism by which that result was reached. In contrast, the Searles request a reversal.

¶ 21 To untangle the threads of the parties' arguments, we first provide a brief overview of the change application process as well as the approach taken by the district court in the present case. We then identify and discuss the appropriate standard of proof and the proper allocation of the burden of proof in the change application context. Finally, we address the Searles' contention that circumstantial evidence demonstrating a probability of impairment can never be sufficient to defeat a change applicant's prima facie showing that no impairment will result from application approval.

## I. THE CHANGE APPLICATION PROCESS AND THE PROCEEDINGS BELOW

¶ 22 Before turning to the parties' arguments relative to the appropriate standard of proof and the proper allocation of burdens, we first provide, for purposes of context, a brief overview of the change application process itself, as well as the procedural course followed by the district court in the present case.

### A. The Change Application Process

¶ 23 Utah law provides that a water right holder is entitled to change the point of diversion or the place or nature of use of water so long as vested rights are not impaired by the change. See Utah Code Ann. § 73-3-3(2) (Supp.2004). The legislature has designated the state engineer as the appropriate officer to initially determine whether an application seeking permission to initiate such a change should be approved. See id. §§ 73-3-3(4), -8 (1989 & Supp.2004). In making that determination, the state engineer is statutorily obligated to "follow the same procedures, and the rights and duties of the applicants with respect to applications for permanent changes of point of diversion, place of use, or purpose of use shall be the same, as provided in this title for applications to appropriate water." Id. § 73-3-3(5)(a) (Supp.2004). Those elements are codified in section 73-3-8 of the Utah Code, which requires, in relevant part, that the State Engineer approve an application if the following conditions are met:

> (a) there is unappropriated water in the proposed source; (b) the proposed use will not impair existing rights or interfere with the more beneficial use of the water; (c) the proposed plan is physically and economically feasible ... and would not prove detrimental to the public welfare; (d) the applicant has the financial ability to complete the proposed works; and (e) the application was filed in good faith and not for purposes of speculation or monopoly.

Id. § 73-3-8(1) (1989). After an application is approved, the applicant is then empowered to construct all necessary works and use the water in the manner contemplated by the change application. See id. §§ 73-3-10, -16 (Supp.2004); Crafts v. Hansen, 667 P.2d 1068, 1082 (Utah 1983) (Oaks, J., dissenting).

¶ 24 In the present case, both the State Engineer and the district court concluded that the Searles satisfied all of the obligations outlined in section 73-3-8(1) except the requirement that the proposed use not impair existing rights. On appeal, the Searles and the State Engineer take exception to the approach adopted by the district court in reaching its conclusion. The State Engineer maintains that the district court improperly shifted the burden of persuasion to Milburn after the Searles made a prima

facie case demonstrating that no rights would be impaired by the approval of their application. Meanwhile, the Searles maintain that the district court correctly shifted the burden of persuasion but improperly imposed only the preponderance of the evidence standard of proof on the issue of impairment. After outlining the approach taken by the district court, we will address in turn the parties' allegations of errors in that approach.

## B. The Approach Adopted by the District Court

¶ 25 As mentioned above, the crux of the parties' disagreement over the appropriateness of the district court proceeding centers on the propriety of the standard of proof invoked by the district court, as well as the manner in which the court allocated the burden of proof. Our pronouncements on the proper standard of proof and the appropriate allocation of the burden of proof in the change application context have not resulted in a clear approach and, in fact, seem to have engendered considerable confusion—evidenced by the fact that all three parties to this appeal read our case law on this issue in a different manner.

¶ 26 The district court relied upon our decision in *Crafts* in concluding that change applicants bear an initial burden to show reason to believe that no impairment will result from the proposed change in use and that a party protesting an application must rebut that prima facie showing by a preponderance of the evidence. In *Crafts,* when discussing the standard of proof and the appropriate allocation of burden in the change application context, we quoted with approval our previous statement on those issues found in *Salt Lake City v. Boundary Springs Water Users Ass'n,* in which we stated as follows:

> If the evidence shows that there is reason to believe that the proposed change can be made without impairing vested rights the application should be approved.... A change application cannot be rejected without a showing that vested rights will thereby be substantially impaired. While the applicant has the general burden of showing that no impairment of vested rights

will result from the change, the person opposing such application must fail if the evidence does not disclose that his rights will be impaired.

2 Utah 2d 141, 270 P.2d 453, 455 (1954) (footnotes omitted). Our statement in *Boundary Springs* remains our most definitive pronouncement on the standard of proof and allocation of burden in the change application context.

¶ 27 Although *Crafts* does contain language touching on those issues, that case directly considered only whether a district court's entry of summary judgment approving five change applications was appropriate. 667 P.2d at 1069. We held that summary judgment was inappropriate under the circumstances and remanded the case to the district court. *See id.* At the conclusion of the *Crafts* opinion, we provided guidance to the district court as to the appropriate course to follow after remand, stating that

> [t]he determinative question before the trial court will be whether there is reason to believe, on the basis of current information, that existing water rights will not be impaired by the changes proposed in the applications. Once the respondents make a prima facie showing at trial that there is reason to believe, on the basis of available data, that the changes can be lawfully approved, the appellants will have the burden of proving by a preponderance of the evidence *either* that the available data is insufficient to give rise to 'reason to believe' *or* that available data in fact creates a reason to believe that the changes cannot be lawfully approved.

*Id.* at 1081 (emphasis in original). While we did provide an articulation of the procedure to follow on remand in *Crafts,* we specifically acknowledged the limit of our holding in that case: "The respondents' arguments respecting the standards for approval of change applications, the burden of proof on the 'reason to believe' issue, and the authority of the State Engineer to make his approval conditional and interlocutory are all accurate. They are, however, irrelevant to the basis upon which we reverse...." *Id.* at 1080.

¶ 28 Regardless of their precedential status, our pronouncements in *Boundary*

*Springs* and *Crafts* serve as the most detailed guidance we have supplied litigants regarding the appropriate standard of proof and proper allocation of burden in the change application context, and the district court was correct in turning to those cases in its attempt to discern the appropriate process. Unfortunately, our previous statements concerning the proper procedure to follow when considering the merits of a change application have been undeniably opaque, and reading our pronouncements on the issue in isolation can result in the imposition of an inappropriate standard of proof and an improper allocation of the burden of proof. However, when *Crafts* and *Boundary Springs* are read in concert with the Utah Code and our prior case law, the muddied water begins to clear, and the appropriate approach becomes apparent.

¶ 29 The parties to the present appeal disagree on three fundamental points relating to the appropriateness of the course followed by the district court: (1) whether the proper standard of proof governing a determination that impairment will result from application approval is "preponderance of the evidence" or some other standard more favorable to a change applicant, (2) whether the burden of persuasion shifts to a protestant after an applicant makes a prima facie showing that application approval will not result in impairment of vested rights, and (3) whether an applicant's prima facie showing of no impairment can be sufficiently undermined by circumstantial evidence so as to make application approval inappropriate. We address each disagreement in turn and conclude that change applicants are required to show only reason to believe that impairment will not result from application approval, that the burden of persuasion remains on change applicants throughout the application process, and that circumstantial evidence may be sufficiently compelling to make application approval inappropriate.

## II. THE STANDARD OF PROOF

¶ 30 Both the State Engineer and Milburn argue that if a preponderance of the evidence establishes that vested rights will be impaired by the approval of a change application, the application must be rejected. On the other hand, the Searles contend that a change application can only be denied if direct, noncircumstantial evidence clearly demonstrates that impairment will actually result from the application's approval. Our case law establishes, however, that the proper standard, "reason to believe," lies somewhere between the two measures advanced by the parties. After first explaining our conclusion that a preponderance of the evidence standard is not appropriate in the change application context, we then discuss and give content to the appropriate, "reason to believe," standard.

### A. A Change Applicant Need Only Show Reason to Believe that No Impairment Will Result from Application Approval

¶ 31 The Utah Code states that a change in water use "may not be made if it impairs any vested right without just compensation." Utah Code Ann. § 73–3–3(2)(b) (Supp.2004). However, at the application phase, our case law makes it clear that a change applicant is only required to show "reason to believe" that no impairment will result from application approval. *See, e.g., Crafts v. Hansen,* 667 P.2d 1068, 1082 (Utah 1983) (Oaks, J., dissenting) (stating that "reason to believe" "is the practical equivalent of a probable cause determination in a criminal case"); *Piute Reservoir & Irr. Co. v. W. Panguitch Irr. & Reservoir Co.,* 13 Utah 2d 6, 367 P.2d 855, 858 (1962) ("[T]he correct rule ... is that the applicant must shown [sic] reason to believe that the proposed application for change can be made without impairing vested rights."); *Am. Fork Irr. Co. v. Linke,* 121 Utah 90, 239 P.2d 188, 191 (1951) ("We recognize plaintiffs' duty to prove that vested rights will not be impaired by approval of their application, but we also recognize that such duty must not be made unreasonably onerous....."); *United States v. Dist. Court,* 121 Utah 1, 238 P.2d 1132, 1135 (1951) ("[The court] must determine from the evidence whether there is probable cause to believe ... that such water can be diverted from the source of supply and used without injury to or conflict with prior rights."); *Eardley v. Terry,* 94 Utah 367, 77

P.2d 362, 366 (1938) ("[W]hen the application is filed, the state engineer is called upon to determine preliminarily whether there is probable cause to believe that an application can be perfected, having due regard to whether ... it can be diverted and so used without injuring or conflicting with the prior rights of others."). Even our decision in *Crafts*, which the district court relied upon when determining the appropriate standard of proof, stated quite clearly that "[t]he *determinative question* before the trial court will be whether there is reason to believe, on the basis of current information, that existing water rights will not be impaired by the changes proposed in the applications." 667 P.2d at 1081 (emphasis added).

¶ 32 In the present case, the State Engineer and Milburn argue that the reason to believe standard only applies at the preliminary stage of the application process and that application approval or denial ultimately rests on the preponderance of the evidence. However, that approach improperly combines the standard of proof applicable to the application process with the standard of proof applicable to a final adjudication of rights.

¶ 33 In other words, the parties' confusion as to the appropriate burden to apply in the change application context stems from an imperfect understanding of the two roles played by the court system when water rights are at issue. In some situations, courts are called upon to adjudicate rights; in other situations, courts are called upon merely to review an administrative decision relating to those rights. The present case falls into the latter category.

■ ¶ 34 As a preliminary matter, it is well established that the state engineer has no authority to finally adjudicate water rights. As we stated in *District Court*, 238 P.2d at 1137, "[t]he Engineer in granting an application does not determine that the applicant's rights are prior to the rights of the protestant but only finds that there is reason to believe that the application may be granted and some water beneficially used thereunder without interfering with the rights of others." *See also Linke*, 239 P.2d at 190 ("[T]he Engineer's findings and decision have

a sanctity extending no further than the authority delegated by law to his office."); *Whitmore v. Murray City*, 107 Utah 445, 154 P.2d 748, 750 (1944) ("The office of state engineer was not created to adjudicate vested rights between parties, but to administer and supervise the appropriation of the waters of the state."). In *District Court*, we stated that the state engineer's decision to approve or reject an application "is administrative in nature and purpose and the decision of the court on review, except for the formalities of the trial and judgment is of the same nature and for the same purpose." 238 P.2d at 1137. *See also Crafts*, 667 P.2d at 1070 (stating that when a district court reviews the state engineer's approval or denial of an application, "[t]he issues ... [are] strictly limited to those which were, or could have been, raised before the State Engineer"); *Dist. Court*, 238 P.2d at 1135 ("[The district court] should simply determine whether the application was rightly rejected. In determining that question, the court stands in the same position as the state engineer did. It must determine from the evidence whether there is probable cause to believe that ... [water can be] used without injury to or conflict with prior rights.").

■ ¶ 35 Accordingly, the conclusion is inescapable that a district court, when reviewing the state engineer's decision to approve or reject an application, is not sitting in its capacity as an adjudicator of rights, but is merely charged with ensuring that the state engineer correctly performed an administrative task. We stated as much in *Eardley*, when we acknowledged that, when conducting a de novo review of the state engineer's approval or rejection of an application, the court simply "determines whether the application should be approved or rejected and does not fix the rights of the parties beyond the determination of that matter." 77 P.2d at 365. As will be discussed in more detail below, it follows that a change applicant should be subjected to a less onerous standard of proof at the application phase than that used during a final adjudication of rights.

¶ 36 Although at first blush it appears that this procedure unjustly favors new appropri-

ations and new uses to the detriment of vested rights, the procedure actually provides a balance between the two policy goals of putting water to the most beneficial use possible while simultaneously guarding vested rights. The procedure accomplishes this by placing a fairly low burden on a party seeking approval of a change application, thereby allowing the party to attempt to perfect the right to use the water in the manner contemplated by the application. If such use can be accomplished without interfering with vested rights, the policy of putting water to the best use possible is furthered without causing injury to anyone. *See Linke,* 239 P.2d at 191 ("[W]e cannot turn a deaf ear to every request which reasonably appears designed for a more beneficial use of water not impairing vested rights by saying, as the Engineer in his decision did, that the proposed change '*could* interfere substantially with the vested rights of others.'" (emphasis in original)); *Dist. Court,* 238 P.2d at 1137 ("[T]he law provides a period of experimentation during which ways and means may be sought to make beneficial use of more water under the application before the rights of the parties are finally adjudicated.").

¶ 37 In other words, the court system serves to ensure that applicants who successfully establish reason to believe that a proposed water use can be accomplished without impairment of vested rights are given the opportunity to prove it. Determining whether an applicant has, in fact, proven that the new manner of use does not impair vested rights is a matter ultimately left to a final judicial determination of rights. We note, however, that the courts are at all times fully empowered to protect vested rights from impairment. Because judicial avenues of protection are available, we have previously stated that, after a change application has been approved, an applicant can only proceed absent "injury to [prior] rights if he hopes to perfect a right.... Legally, no one can be hurt by the procedure established by the Legislature. At the same time, however, it permits the development of our water resources to the utmost." *Eardley,* 77 P.2d at 366–67.

¶ 38 By establishing this system, the legislature gave practical effect to its determination that the possible benefits to be derived from a liberal policy toward application approval outweigh the potential of possible temporary harm if a use proposed in an application results in an impairment of vested rights. The value of allowing experimentation cannot be understated. As we stated in *District Court,* 238 P.2d at 1137,

[i]f we were to finally adjudicate applicant's right to change or to appropriate water at the time that such application was rejected or approved, he would get only such rights as he could establish by a preponderance of the evidence that he could use beneficially without interfering with the rights of others and in such hearing he would not have the benefit of any opportunity to experiment and demonstrate what he could do. Such a system would cut off the possibility of establishing many valuable rights without a chance to demonstrate what could be done.

Our pronouncement in *District Court* nicely illustrates the danger of moving the preponderance burden, applicable when making a final determination of rights, to the application phase.

¶ 39 Pursuing a policy that allows experimentation with water use is not antithetical to a strong and legitimate desire to protect the vested rights of other water users. The procedures in place do not allow experimentation simply for the sake of experimentation, and they certainly do not allow the vested rights of vigilant water users to be impaired by new use. *See Eardley,* 77 P.2d at 366 ("Filing the application does not give the applicant the right or license to proceed to the injury of prior rights. He can proceed only upon an absence of injury to such rights if he hopes to perfect a right....").  Given that the courts will remain open to water users whose rights face impairment, the possibility of a water user with vested rights suffering an irreparable injury due to the approval of a change application is limited.

¶ 40 We recognize that a change applicant assumes a risk by investing time and money in an effort to perfect a proposed change in use that may later be effectively disallowed

or modified by a court in an adjudicatory proceeding. This risk allocation is, however, in accord with the balance struck between the competing policies of encouraging experimentation with water use on one hand and of guarding the vested rights of this state's water users on the other. It is the change applicant who seeks to reap the benefit of the change in water use, and it is the applicant who must bear the risk that the proposed use, once initiated, may run afoul of prior rights. In this way, the law properly forces the change applicant to assess risks and rewards, and to demonstrate confidence in the propriety of a proposed use by financing its commencement.

¶ 41 We also recognize that the experimentation period is most effective when the effects of any change in use can be easily observed and calculated. When a change applicant is confronted with a situation in which the experimentation period is unlikely to provide evidence beyond that known at the time a change application is initially filed, it may be wise for that applicant to seek a declaratory judgment under the more demanding preponderance of the evidence standard before expending resources to effectuate the proposed use. *Cf. Whitmore*, 154 P.2d at 751 (allowing a change applicant to pursue a declaratory action as to the priority of certain rights even though the applicant's proposed change had yet to be perfected).

¶ 42 Having concluded that the reason to believe standard governs the change application process and that a preponderance standard is reserved for a final adjudication of rights, it is apparent that we must remand to enable the district court to consider the evidence with the proper standard in mind. To aid the district court in this process, we now provide content to the reason to believe standard and will then address the parties' arguments relative to the appropriate allocation of the burden of proof before turning to our final inquiry: whether a protestant can block application approval through the use of circumstantial evidence that establishes a probability that impairment will result if the change application is approved.

*B. The Reason to Believe Standard*

¶ 43 Although our case law has clearly established that a change applicant is required to show reason to believe that application approval will not result in impairment of vested rights, the content of that standard remains less than clear. The Searles argue on appeal that a protestant seeking to defeat application approval can only succeed by producing direct evidence of actual impairment. In the Searles' view, evidence of "likely" impairment—regardless of how likely that impairment is—may be—will always be insufficient to defeat application approval.

¶ 44 In his dissent in *Crafts,* Justice Oaks endorsed a view similar to that advanced by the Searles, opining that "[a] change application should only be denied when, after resolving all contradictions in favor of the proponent of change, the evidence offered is so deficient that it provides no reason to believe that the proposed change could be made without impairing rights." 667 P.2d at 1083 (Oaks, J., dissenting). Although we concur, as did the *Crafts* majority, with Justice Oaks's understanding that the preliminary nature of the application process favors placing a burden on applicants that is not unduly onerous, we disagree with Justice Oaks's conception of that standard.

¶ 45 Adopting such a low quantum of proof would turn the state engineer into nothing more than a rubber stamp, approving every change application submitted. As mentioned above, the procedures put in place by the legislature do not allow experimentation simply for the sake of experimentation. To adequately serve its purpose, the application process must provide some meaningful barrier so that the floodgates remain closed to all applications except those with a sufficient probability of successful perfection.

¶ 46 With that concern in mind, we conclude that the reason to believe standard is best understood as falling between the preponderance standard applicable in final adjudications and Justice Oaks's conception of the reason to believe standard as the lowest of hurdles. Specifically, we reassert the validity of our prior, admittedly opaque pronouncements, and now clarify that a change applicant's burden is satisfied if there is suffi-

cient evidence to support a reasonable belief that the changes outlined in the application can be perfected without impairing vested rights. In other words, to gain application approval, a change applicant must convince the decisionmaker that there is reason to believe that the use proposed in the application can be undertaken without impairing vested rights. However, before application approval is warranted, it must be clear that the decisionmaker's determination that there is reason to believe is grounded in evidence sufficient to make that belief reasonable. *Cf. State v. Clark*, 2001 UT 9, ¶ 16, 20 P.3d 300 (establishing a "reasonable belief" standard for use in criminal probable cause determinations and providing that at "the preliminary hearing stages, the prosecution must present sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed it"). Just as the probable cause standard applicable to preliminary hearings in criminal cases serves the primary purpose of "ferreting out ... groundless and improvident prosecutions," *State v. Anderson*, 612 P.2d 778, 783 (Utah 1980), so does the reason to believe standard serve to stem the flow of proposed changes in water use by arresting any proposal not supported by a reasonable belief that the change can be accomplished without impairing vested rights.

¶ 47 This standard is both workable and consistent with our prior cases that have analogized the reason to believe standard to the probable cause standard applicable during the preliminary phase of a criminal trial. *See, e.g., Crafts*, 667 P.2d at 1082 (Oaks, J., dissenting) (stating that the reason to believe standard "is the practical equivalent of a probable cause determination in a criminal case"); *Dist. Court*, 238 P.2d at 1135 ("[The court] must determine from the evidence whether there is probable cause to believe

... that such water can be diverted ... without injury to or conflict with prior rights.").

¶ 48 Having articulated the proper conception of the reason to believe standard, we now address the appropriate allocation of the burden of proof before addressing the Searles' contention that a reason to believe showing can only be undermined by direct evidence of actual impairment.

## III. THE BURDEN OF PROOF

¶ 49 The Searles argue that after a change applicant makes a prima facie showing that no impairment will result from application approval, the burden of persuasion to show impairment shifts to the party protesting the application. The State Engineer argues that the burden of persuasion should remain on the change applicant at all times during the application process. We agree with the State Engineer that there is no shift in the burden of persuasion.[2]

¶ 50 As an initial matter, we note that there are sound policy reasons for placing the burden of persuasion squarely on the change applicant. As we acknowledged in *Tanner v. Humphreys*,

> "[i]f the change is made, it disturbs the existing order ... and causes a modification to be made in the general adjudication decree. It is fitting that a party who asks such relief should bear the burden of proving that the vested rights of others will not thereby be infringed if it is granted. It is only the burden which is usually imposed upon the moving party in a lawsuit."

87 Utah 164, 48 P.2d 484, 488 (1935) (quoting *New Cache La Poudre Irr. Co. v. Water Supply & Storage Co.*, 49 Colo. 1, 111 P. 610, 611 (1910) and citing *Monte Vista Canal Co.*

2. The terminology covering evidentiary burdens is highly confusing, as various courts and commentators have used prevalent terms in different ways. Generally speaking, there are two evidentiary burdens: a burden of persuasion and a burden of production. *See Koesling v. Basamakis*, 539 P.2d 1043, 1046 (Utah 1975). "Burden of persuasion" refers to "[a] party's duty to convince the fact-finder to view the facts in a way that favors that party." *Black's Law Dictionary* 190 (7th ed.1999). "Burden of production" re-

fers to "[a] party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling." *Id.* Finally, "burden of proof" is a catchall term that encompasses both the burden of persuasion and the burden of production and generally refers to "[a] party's duty to prove a disputed assertion or charge." *Id.* In the present case, the parties assign error only to the district court's allocation of the burden of persuasion.

*v. Centennial Irr. Ditch Co.,* 24 Colo.App. 496, 135 P. 981 (1913)).

¶ 51 We recognize that language from our previous cases can be read as contemplating some sort of formal shift in the burden of persuasion. However, that language is better understood as an acknowledgment of the reality that once an applicant has produced sufficient evidence to persuade the decisionmaker that there is reason to believe that no vested rights will be impaired by application approval, a protestant will fail if evidence is not introduced that undermines the applicant's proof. Perhaps the present confusion has been caused by our use of the phrase "prima facie showing" to describe the amount of evidence that a change applicant must put forward when seeking application approval. *See* Edward L. Kimball & Ronald N. Boyce, *Utah Evidence Law* 3–8 (1996) (" 'Prima facie evidence' is an ambiguous phrase."). Generally speaking, a prima facie showing is made by successfully producing enough evidence to survive a motion to dismiss and to send the matter to the jury. *See Johnson v. Bell,* 666 P.2d 308, 311 (Utah 1983). However, we have noted that the general concept of a "prima facie showing" operates differently when there is no jury. *See id.* In *Johnson,* we explained that "[t]o apply the jury trial practice [applicable to prima facie showings] in non-jury proceedings would be to erect a requirement compelling a defendant to put on his case . . . if the plaintiff had, according to jury trial concepts, made 'a case for the jury,' " even if the judge had already concluded that the plaintiff ought not to prevail. *Id.* (internal quotation marks omitted).

¶ 52 In keeping with this distinction, we have, in the context of the change application process, used the phrase "prima facie showing" to denote the amount of evidence that would be sufficient to warrant application approval absent the presentation of additional evidence undermining confidence in an applicant's proof that no impairment of vested rights will result from the use proposed in the application. *Cf. Godesky v. Provo City Corp.,* 690 P.2d 541, 547 (Utah 1984) ("Prima facie evidence means only that quantum of evidence that suffices for proof of a particu-

lar fact until the fact is contradicted by other evidence." (internal quotation marks omitted)).

¶ 53 In the final calculation, a change applicant will be entitled to application approval only if the decisionmaker is persuaded that there is no reason to believe that vested rights will be impaired if the application is approved. To successfully persuade the decisionmaker, an applicant must produce evidence sufficient to support a reasonable belief that no impairment will result from application approval. As a result, there may be situations in which even an unopposed change application is not approved because the applicant has failed to adequately persuade the decisionmaker that there is reason to believe that no harm will result from approval. However, any party protesting a change application is certainly entitled to present evidence in an effort to convince the decisionmaker that application approval is not warranted under the circumstances.

¶ 54 Having clarified that the burden of persuasion remains on the change applicant throughout the application process, we next address the Searles' contention that a reason to believe showing can only be undermined by direct evidence of actual impairment.

## IV. A CHANGE APPLICATION CAN BE DEFEATED THROUGH THE USE OF CIRCUMSTANTIAL EVIDENCE

¶ 55 While producing evidence sufficient to block approval of a change application is no doubt a difficult task for a protestant, illustrating impairment by means not reliant on conjecture or probability would, in many cases, be an impossible task. Determinations of whether impairment would result from application approval often hinge on probabilities. As we pointed out in *Crafts v. Hansen,*

[t]he future impact of changes in allocation and use of water resources in a large geographical area is not generally susceptible of direct observation, measurement and calculation. Great reliance must be placed upon expert judgment based on professional knowledge and training, familiarity with the geography, and as much accurate data as can be acquired in the process of mak-

ing future projections.... [W]e are not dealing so much with "facts" ... as with the opinion of experts about the accuracy and legitimacy of the projections based upon the available facts.

667 P.2d 1068, 1081 (Utah 1983). Consequently, we cannot say that circumstantial evidence showing a possibility of impairment is, in all cases, insufficient to justify denying an application.

¶ 56 If the evidence produced by a protestant is compelling enough to undermine the reasonableness of the assertion that the proposed change will not impair vested rights, the state engineer should reject the application seeking to effect that change. We can envision situations in which circumstantial evidence could undermine an applicant's evidence to such an extent that it would be unreasonable to believe that the proposed change can be accomplished without impairing vested rights. Consequently, we decline to exclude circumstantial evidence from being weighed when a decision as to application approval must be made.

## CONCLUSION

¶ 57 We conclude that the district court invoked the wrong standard of proof and improperly allocated the burden of proof in undertaking its review of the State Engineer's denial of the Searles' change application. A change applicant is required only to show reason to believe that the proposed use can be undertaken without impairing vested rights in order for the application to warrant approval. The burden of persuasion remains on the applicant throughout the application process, although the protestant has the opportunity to provide evidence undermining the applicant's reason to believe showing. In producing such evidence, a protestant may rely exclusively on circumstantial evidence. Whether such evidence is sufficient to compel the denial of an application will depend on the unique facts of each case. Accordingly, we remand this case to the district court for reconsideration under the standard outlined in this opinion.

¶ 58 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.